1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10   WILLIAM KIVETT and BERNARD and
     LISA BRAVO, individually, and on behalf
11   of others similarly situated,                    No.  C 18-05131 WHA

12              Plaintiffs,

13        v.                                          **ORDER RE PLAINTIFFS' MOTION
                                                      FOR SUMMARY JUDGMENT**
14   FLAGSTAR BANK, FSB, a federal savings
     bank,
15
                Defendant.
16

17

18                                    **INTRODUCTION**

19        In this certified class action against defendant bank for non-payment of interest on

20   escrows for California borrowers, as required under Section 2954.8(a) of California's Civil

21   Code, brought under Section 17200 of California's Business and Professions Code, plaintiffs

22   move for summary judgment, requesting restitution and injunctive relief.  A prior order already

23   determined the bank's liability, finding it in violation of Section 2954.8(a), and thereby liable

24   under the "unlawful" prong of Section 17200.  This order grants plaintiffs' request for

25   restitution of accrued and outstanding interest on escrows that the bank failed to pay to class

26   members.  Because its violations of Section 2954.8(a) are ongoing with respect to a subclass of

27   class members whose loans it continues to service, this order certifies a subclass under Rule

28

*United States District Court*
*Northern District of California*

23(b)(2), appoints subclass representatives, and grants injunctive relief thereunder.  To the extent stated herein, therefore, plaintiffs' motion for summary judgment is **GRANTED**.

## STATEMENT

Section 2954.8(a) of California's Civil Code requires:

> Every financial institution that makes loans upon the security of real property containing only a one-to four-family residence and located in this state or purchases obligations secured by such property and that receives money in advance for payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, shall pay interest on the amount so held to the borrower.  The interest on such amounts shall be at the rate of at least 2 percent simple interest per annum.  Such interest shall be credited to the borrower's account annually or upon termination of such account, whichever is earlier.

In short, California's interest-escrow-law requires financial institutions to pay certain borrowers at least two percent annual interest on funds held in borrowers' escrow accounts. Such accounts are typically set up in conjunction with a home loan — indeed often as a condition by a lender — to ensure payment of property obligations associated with a home loan, such as property taxes.

Defendant Flagstar Bank, FSB, is a federally chartered savings bank, which originates, purchases, sells, and services home loans covered by Section 2954.8(a).  After a loan is originated, it is typically sold in the secondary market to third-party investors.  This leads to a bifurcation of the loan into two main assets: "[o]ne is the beneficial ownership of the loan and the other would be the income received to do the actual servicing activities" (Chang. Dep. 13:21–14:19).  The latter creates the mortgage servicing right ("MSR") asset.

From at least 2014 until January 28, 2017, Flagstar categorically failed to pay or credit interest on escrow ("IOE") to California borrowers' whose loans Flagstar serviced (Ryan Dep. 47:4–7).  More specifically, when Flagstar collected money in advance from California borrowers for payment of taxes and assessments on a property mortgaged as security for a home loan, or for insurance, for example, it failed to pay them the two percent interest per annum required under Section 2954.8(a).  Beginning on January 28, 2017, however, Flagstar began a phased-out process of prospectively paying IOE for loans that it subserviced on behalf

United States District Court
Northern District of California

of third-party investors who owned the mortgage servicing rights (Ryan Dep. 46:21–47:2). Though Flagstar now complies with Section 2954.8(a) for all loans it subservices for third-party investors, it still does not pay IOE on loans for which *it* owns the mortgage servicing rights (Ryan Dep. 34:13–19; 45:14–16); nor does it plan to (Ryan Dep. 47:24–48:2) (*see also* Stip. Fact ¶ 6). Its reason: federal preemption. More specifically, Flagstar says that the Home Owner's Loan Act ("HOLA") — applicable to federal savings associations such as itself — preempts Section 2954.8(a) and thus exempts it from paying IOE.

In 2018, however, our court of appeals held that the passage of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act changed the federal preemption scheme. *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 (9th Cir. 2018). In so holding, it found that the National Bank Act does not preempt Section 2954.8(a). *Id*. at 1197. Various actions against banks, including this one, ensued. *See McShannock v. JP Morgan Chase Bank N.A.*, 354 F.Supp.3d 1063 (N.D. Cal. 2018) (Judge Edward Chen); *see also Wilde v. Flagstar Bank FSB*, No. 18-cv-1370-LAB (BGS), 2019 WL 1099841 (S.D. Cal. Mar. 8, 2019) (Chief Judge Larry Alan Burns).

In April 2018, Lowell and Gina Smith brought this civil action against Flagstar. They alleged that in October 2004, they'd obtained a loan to finance their purchase of real property located in California. They had executed a deed of trust as security for the loan. The deed of trust called for the establishment of an escrow impound account and required that interest be paid on funds in the escrow account if doing so was required by applicable law. Flagstar then took over the servicing of the Smiths' mortgage account and remained the loan servicer until August 2015. No interest accrued on their escrow funds (Case No. 18-02350, Dkt. No. 1).

The Smiths' complaint alleged two claims against Flagstar: (i) breach of contract, and (ii) violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq*. In August 2018, a Rule 12 order dismissed that complaint without prejudice due to the Smiths' failure to comply with a threshold notice-and-cure requirement provided by the deed of trust. Judgment then entered in favor of Flagstar and against the Smiths (Case No. 18-02350, Dkt. Nos. 1, 38). The Smiths quickly provided Flagstar written notice and an

3

opportunity to cure, which Flagstar refused.  Having fixed the cure issue, the Smiths filed the instant suit, alleging the same claims on the same facts as before (Case No. 18-05131, Dkt. No. 1).

In October 2018, William Kivett came in as another plaintiff.  He only alleged a violation of Section 17200 (Dkt. No. 30 at 2).  In 2012, Kivett and Flagstar had executed a promissory note reflecting a $400,610 mortgage loan secured by a deed of trust on a California residential property.  Flagstar serviced Kivett's loan from its inception until 2015 when he refinanced his loan with another institution.  Pursuant to the deed of trust, Flagstar "established and maintained an escrow account for the payment of [Kivett's] property taxes and insurance premiums and other potential charges related to the property" throughout that time (Stip. Fact ¶ 5).

Following discovery and motion practice, summary judgment issued in favor of Flagstar, dismissing the Smiths from this action.  In brief, that order found that the Smiths' claims were still preempted by HOLA because Section 1043 of the Dodd-Frank Act preserved HOLA's preemption scheme for any contract entered into on or before July 21, 2010, "by national banks, [f]ederal savings associations, or subsidiaries thereof . . ." 12 U.S.C. § 5553.  Because Flagstar, a federal savings association, had participated in the origination of the Smiths' 2004 loan, their claims were dismissed.

Kivett pressed on.  Then, a November 2019 order appointed Kivett as class representative and certified the following class pursuant to Rule 23(b)(3) (Dkt. No. 120):

> All persons who on or after April 18, 2014 had mortgage loans serviced by Flagstar Bank FSB ("Flagstar") on 1–4 unit residential properties in California and paid Flagstar money in advance to hold in escrow for the payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, but did not receive interest on the amounts held by Flagstar in their escrow accounts (excluding, however, any such persons whose mortgage loans originated on or before July 21, 2010) (the "Class").

That class was "certified as to plaintiff Kivett's Section 17200 claim, except for prospective injunctive relief" (*id*. at 13).  But, in express contemplation of seeking injunctive relief, Kivett had also moved for leave to amend in order to add Bernard and Lisa Bravo as

United States District Court
Northern District of California

named plaintiffs.  On December 1, 2017, the Bravos had executed a promissory note with California Financial Real Estate Center, Inc., secured by a deed of trust on a California property.  The servicing rights to the Bravos' loan were almost immediately transferred from Financial Real Estate Center to Flagstar (Mansell Decl. ¶¶ 6–7).  Pursuant to the terms of the deed of trust, Flagstar "maintained an escrow account for the Bravos upon servicing the loan from origination through present" (*id*. at ¶¶ 8–9).  Unlike Kivett's loan, therefore, Flagstar *currently* services the Bravos' loan for which Flagstar still does not pay any IOE to.

Accordingly, the "primary purposes" for seeking leave to amend, as stated in the class certification order, was to add the Bravos as class representatives "to ensure standing for an injunction and a class under Rule 23(b)(2)" (Dkt. No. 120 at 4).  Rejecting Flagstar's arguments of prejudice and futility, the class certification order also granted Kivett's motion for leave to amend the first amended complaint.  More specifically, that order held that Kivett's "motion for new plaintiffs to intervene and for leave to amend to add new class representatives [was] provisionally GRANTED" (*id*. at 13).  It ordered Kivett's counsel to "promptly make the Bravos available for depositions and to produce their records to Flagstar by December 6, 2020."  Flagstar, in turn, had until January 2, 2020, to show cause "why the Bravos should not be authorized to co-represent the class" (*ibid*.).  Flagstar failed to show cause by that date.

Instead, on January 2, 2020, the parties submitted a joint stipulation and proposed order, which slightly altered the class definition and included the details of the parties' proposed form of notice to the class.  An order then entered the proposed order, approving the parties' notice plan, and redefined the class as follows (Dkt. No. 144) (emphasis in original):

> All persons who **at any time** on or after April 18, 2014 **through September 30, 2019** had mortgage loans serviced by Flagstar Bank, FSB ("Flagstar") on 1–4 unit residential properties in California and paid Flagstar money in advance to hold in escrow for the payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, but did not receive interest on the amounts held by Flagstar in their escrow accounts (excluding, however, any such persons **(a)** whose mortgage loans originated on or before July 21, 2010 **or (b) who would be owed less than $1 in interest-on- escrow as of September 30, 2019 if plaintiffs' allegations are proven**) (the

"Class").

Notice was effected.  Out of the 139,923 class members, four opted out.

In December 2019, the parties filed cross-motions for summary judgment.  Finding *Lusnak* controlling, and Flagstar's proposed exceptions unpersuasive, a March 2020 order denied Flagstar's motion, and granted plaintiffs' motion for partial summary judgment instead (Dkt. No. 154).  In so ruling, that order found that plaintiffs had established Flagstar's liability under Section 17200 for failing to pay or credit two percent interest on the positive balances in California borrowers' escrow accounts in violation of Section 2954.8(a).  That order also found that "Flagstar does not and has not paid any interest on California loans owned by Flagstar" (Dkt. No. 154).  That is, while Flagstar now complies with Section 2954.8(a) — *i.e.*, pays IOE — for loans that it subservices for third-party investors, it remains in violation of the same for loans whose mortgage servicing rights Flagstar itself owns and services.

Plaintiffs now move for summary judgment seeking restitution for accrued and outstanding IOE owed to class members through December 31, 2019, and prejudgment interest of two percent per annum thereon.  Additionally, plaintiffs also seek a permanent injunction ordering Flagstar to comply with Section 2954.8(a) — to pay and/or credit IOE that accrues from January 1, 2020, onward, to *current* Flagstar customers (Dkt. No. 174).  To repeat, while Flagstar has now completed its phased-out process of paying IOE to class members whose loans it subservices on behalf of third-parties who own the mortgage servicing rights, Flagstar itself continues *not* to pay IOE to class members whose MSR Flagstar owns and whose loans it currently services.  Flagstar opposes.  It argues that there are numerous triable issues for trial.  For example, it argues that there are disputed issues of fact as to whether or not the amount of restitution to class members should be *offset* by unrelated expenses that it ostensibly incurred with respect to the 8,936 class loans that were "in default"; the 722 class loans that were "in foreclosure"; and the 41,523 class loans that carried negative escrow balances (Albers Decl. ¶ 6).

A review of the evidence in the record, however, shows that there are no triable issues of fact.  Flagstar has not presented any evidence of any unreimbursed cost exacted against any

United States District Court
Northern District of California

particular class loan in this litigation.  Instead, it presents amorphous, globalized, and conjectural evidence — and in some case, none at all — in an attempt to manufacture after-the-fact expenses where none existed prior to class certification.  Thus, it has failed to carry its burden in showing any offset is merited in law or in equity, and the class is entitled to restitution and injunctive relief, as now discussed.

### 1.   THE EVIDENCE.

Plaintiffs' expert, Arthur Olsen, is an expert in data analysis.  Flagstar's expert is David M. Skanderson, Ph.D., a former head of compliance at Washington Mutual Bank F.A., and the current Vice President of an economic consulting firm.  Skanderson has extensive history testifying in mortgage lending and servicing matters (Powell Decl. Exh. A).

Using the same data sets, and "implement[ing] the basic IOE calculations that are outlined in Flagstar's operating procedures," both experts calculated the same number of class loans (139,923).  They also calculated the total amount of accrued and unpaid IOE for the subject loans "within a penny or two" difference, leading Expert Skanderson to testify that "[he] has no issues with the accuracy of [Olsen's] calculations mathematically" (Skanderson Dep. 19:11–18).  In his report, Expert Olsen calculated total outstanding IOE to be $8,536,758.84.  Though Expert Skanderson's report does not independently state his corresponding figure, it states that the figure differs from Expert Olsen's by *just two cents* (Skanderson Report at 9 n.7).  Both experts used two percent as the annual interest rate in calculating IOE.  Both experts ignored all negative and zero daily escrow account balances carried by any borrower who held one; instead, they only applied a two percent interest rate to positive daily escrow account balances that all class members held throughout the class period, and aggregated those amounts in coming up with $8,536,758.  For example (Olsen Report ¶ 21(c)):

> [S]uppose a loan had an escrow balance of $10,000 as of January 10, 2017.  In that case, interest outstanding for that day would be $0.55, which is the daily interest rate (i.e., .02/365) multiplied by $10,000 (the daily escrow balance for that day).  The process was then repeated for each day for each Class Loan.

United States District Court
Northern District of California

7

1    Expert Olsen's figure, moreover, excluded loans owned by third-party investors, for

2  which Flagstar had started paying IOE, for the appropriate and relevant time periods. For

3  instance, with respect to loans whose mortgage servicing rights were owned by Lakeview, but

4  for which Flagstar subserviced the loans on Lakeview's behalf, the experts ignored escrow

5  account activity after March 2017, the date Flagstar started prospectively paying IOE for those

6  loans. The amounts of unpaid IOE which accrued prior to that date, however, were included in

7  the total figure. (Olsen Report ¶ 21(d)). The experts observed this methodology for all

8  applicable loans. The experts' reports, however, only included calculations through July 2019,

9  not through December 31, 2019 — the date through which plaintiffs request restitution.

10    Along with its opposition to plaintiffs' motion for summary judgment, however, Flagstar

11  includes the supplemental declaration of Expert Skanderson, wherein he incorporates the

12  relevant data through December 31, 2019. Expert Skanderson revises his calculations to not

13  only reflect IOE that *accrued* from August through December 2019, but also "updated

14  information regarding certain MSR holder's loans for which previously unpaid IOE has now

15  been *paid*" (Skanderson Suppl. Decl. ¶ 2) (emphasis added).

16    More specifically, Expert Skanderson represents that Flagstar has now paid all of the

17  accrued IOE that was owed to class members whose mortgage servicing rights are owned by

18  Lakeview and New Residential Mortgage. While Flagstar had begun prospectively paying

19  IOE on the Lakeview loans as of March 2017, and on the New Residential loans as of May

20  2018, the amounts accrued before those periods remained unpaid and thus part of the

21  $8,536,758 figure above. Additionally, his updated figures exclude the four class members

22  who opted out of this class action (*id*. at ¶ 6). Making the foregoing adjustments, Expert

23  Skanderson represents that the number of class loans is now 139,492; and the amount of

24  accrued and unpaid IOE through December 31, 2019, is $8,101,175.65 (*id*. at ¶ 7).

25    In their reply brief, plaintiffs accept Flagstar's representations of amounts paid to

26  borrowers whose mortgage servicing rights are owned by Lakeview and New Residential.

27  Moreover, plaintiffs also supply the declaration of Expert Olsen similarly implementing the

28  after-acquired data information, including accrued interest on positive escrow balances through

8

December 2019 (Olsen Decl. ¶¶ 1–6).  Applying the same methodology as before, he, too, provides updated figures for class membership, total amount of unpaid and accrued IOE through December 2019, and the total amount of prejudgment interest plaintiffs seek, as follows (*id*. at ¶ 5):

|  | As of 12/31/2019 Loans | As of 12/31/2019 IOE | As of 5/21/2020 prejud. int. at 2% | Daily prejudgment interest at 2% |
|---|---|---|---|---|
| Prior | 139,923 | $8,536,758.84 | $567,582.51 | $467.77 |
| **Adjusted** | **139,492** | **$8,101,175.64** | **$541,053.11** | **$443.90** |
| Difference | 431 | $435,583.20 | $26,529.40 | $23.87 |

To the foregoing extent, therefore, there is no dispute of fact or difference of opinion between the parties' experts.  The scope of their assignments, however, differed.  Thus, this order briefly summarizes their findings and opinions as to those differing subjects.  In brief, Expert Olsen was asked to calculate prejudgment interest while Expert Skanderson was asked to list categories of expenses Flagstar could potentially offset against accrued and unpaid IOE to class members.

### A. EXPERT OLSEN'S CALCULATION OF PREJUDGMENT INTEREST.

In calculating the prejudgment interest figure in the above table, Expert Olsen "distinguished between IOE accruals and the date those accruals should have been paid (or credited) to each Class Loan."  More specifically, he "assumed that IOE accruals should have been paid on the first day of the following calendar year or the day after termination of the account, whichever was earlier."  For instance (Olsen Report ¶ 21(e)):

> [S]uppose a Class Loan had an escrow balance through February 28, 2015, but did not contain an escrow balance after that date.  In that case, IOE accruals for 2014 would have a due date of January 1, 2015, but the IOE accruals for 2015 would have a due date of March 1, 2015.

Indeed, Expert Olsen's assumptions are consistent with not just Section 2954.8(a) ("Such interest shall be credited to the borrower's account annually or upon termination of such account, whichever is earlier."), but also with Flagstar's own practice.  That is, through Stephanie Ryan, Flagstar testified that for loans that Flagstar does pay IOE, Flagstar credits

United States District Court
Northern District of California

their accrued interest at the end of the calendar year, or upon termination of an escrow account, whichever is earlier (*see* Ryan Dep. 26:8–18).

Since any IOE that Flagstar would have credited to borrowers' escrow accounts would have also earned two percent interest, Expert Olsen used a two percent interest rate in calculating prejudgment interest.  Unlike Expert Olsen, Expert Skanderson does not provide a figure for prejudgment interest.  But Expert Skanderson testified that, assuming "the interest that was credited remains in the escrow account," he had "no principled objection" to a two percent interest rate for prejudgment interest used by Expert Olsen (Skanderson Dep. 23:1–26:5).  Expert Skanderson agreed that had Flagstar credited class members' escrow accounts for interest that accrued at the point where they became due, that interest itself would also earned interest at two percent, assuming the credited interest would have stayed in the escrow account.  He also agreed with Expert Olsen's methodology in calculating prejudgment interest inasmuch as Expert Olsen assessed prejudgment interest based on the following assumptions: (1) Flagstar would have credited accrued IOE to class members' escrow accounts at the end of the calendar year; (2) or, in the event that a class members' account was terminated prior to the end of the year, at the point of termination.

Thus, Expert Skanderson testified that, assuming two percent was indeed an accurate prejudgment interest rate, he agreed with Expert Olsen's figure for the total amount of prejudgment interest (*id*. at 28:12–29:4; 46:23–25).  In short, he agreed that "2 percent represents [class members'] opportunity cost" as a matter of economics (*id*. at 23:6–14).

### B.   EXPERT SKANDERSON'S OPINION REGARDING CATEGORIES OF OFFSETS.

In his report, Expert Skanderson opines that any restitution for unpaid IOE to class members should be offset by losses imposed on Flagstar arising from situations where class members defaulted on their mortgage loans; entered foreclosure; filed for bankruptcy; received a loan modification; struck a forbearance agreement; or carried a negative escrow balance at any point during the class period (Skanderson Report ¶¶ 33–40).

United States District Court
Northern District of California

According to Mark Albers, the First Vice President of Flagstar, his analysis of the class loans in this action show that of the 139,923 total loans, 8,936 were "in default," 722 were "in foreclosure," and 41,523 had a negative escrow balance for at least one monthly period from January 2014 through December 2019 (Albers Decl. ¶ 6).  Flagstar maintains that defaults and foreclosures "often" lead it to incur unreimbursed costs, including "costs related to tasks such as property inspections, retention of counsel, retention of a foreclosure trustee, as well as other hard costs related to filing fees and Broker Price Opinions" (White Decl. ¶ 5).  "Flagstar calculates *an average* of $8,034.16 in un-reimbursed costs per each defaulted loan where non-judicial or judicial foreclosure proceedings have been performed" (*id*. at ¶ 6) (emphasis added).

With respect to the class members whose escrow accounts carried a negative balance, Expert Skanderson opines that "the costs imposed on the servicer include the working capital cost of advancing funds on behalf of the borrower, which is a tangible financial cost to the loan servicer" (Skanderson Report ¶ 35).  With respect to class members who obtained loan modifications and/or forbearance agreements, he opines that "the servicer and investor incur the cost of reduced or deferred interest income from a loan" (*id*. at ¶ 36).  With respect to foreclosures, he opines that Flagstar loses a portion of the outstanding principal balance of a loan (*id*. at ¶ 38).  "Similarly, any loans that were discharged in bankruptcy would have imposed costs on Flagstar (charged-off principal, foregone interest, legal costs, and other costs), which would offset any IOE that Flagstar may have been obligated to pay the borrower to the extent that those costs were borne by Flagstar" (*id*. at ¶ 37).

In his report, Expert Skanderson states that with the exception of class loans that carried a negative escrow balance, the *number* of class loans which would fall within the other potential offsets categories he identifies, cannot be ascertained from the data Flagstar provided him.  And, even if the number of loans in each of his offset categories could be identified, he opines that (*id*. at ¶ 41) (emphasis added):

> the *amount* of offset for each loan could not be identified by applying a standard data query or calculation to the data.  The type of calculation required to determine offsets would differ among the categories of loans subject to offsets and, based on [his] experience in analyzing loan servicing data, such calculations generally could

United States District Court
Northern District of California

not be performed by applying straightforward and uniform queries to loan servicing data.  In most cases, analysis of data beyond those contained in the escrow account histories and manual review of documents would need to be performed.

In short, even if the number of class loan in each category of offset are identified, Expert Skanderson's position is that a "loan-by-loan review of Flagstar's servicing records would be required to calculate the amount of offset for loans subject to offsets"; assuming, of course, such offsets are legally cognizable to begin with (Skanderson Report ¶ 11(e)).  For example, he states that for loans that had a negative escrow balance over some period of time (*id*. at ¶ 42):

An offset could be calculated by determining an interest rate that represents Flagstar's cost of working capital and applying that rate to the (negative) balance for periods during which a negative balance occurred.  The resulting amount would be subtracted from the IOE accrued for such loans during periods for which the average daily escrow balance was positive.

To bolster this claim, Flagstar now submits the declaration of Sean Mansell, Flagstar's Director of Servicing Loans, who swears that (Mansell Decl. ¶ 5):

For customers who accrue a negative escrow balance for any period of time, Flagstar must advance its own funds on behalf of the customer to make the customer's tax, insurance payments, or other property related payments.  In doing so, Flagstar incurs direct and indirect costs associated with advancing such funds, proportionate with the funding costs for Flagstar (i.e., the effective interest rate paid for working capital) at the time each amount was advanced, which can vary based on market fluctuations.

Both experts agree that a total of 41,523 loans within the class carried negative escrow balances on one or more days throughout the class period.  Applying a two percent interest rate, Expert Olsen calculated the cost bore to Flagstar for advancing funds to these 41,523 loans to be $142,766.88 (Olsen Decl. ¶ 12).[1]

Unlike Expert Olsen, Expert Skanderson testified that he was not asked to quantify the effect of crediting Flagstar's costs associated with negative escrow balances against accrued and unpaid IOE; but that he easily could have done so if he was supplied with information pertaining to Flagstar's cost of funds.  Instead, Expert Skanderson only calculated the total

[1] Flagstar contends that Expert Olsen's use of a two percent interest rate in calculating $142,766.88 figure "is not grounded in any evidentiary support," and is plaintiffs' attempt to "simplify the calculation."  Pointing to Expert Skanderson's report, Flagstar contends that the calculation is "more complex," requiring knowledge of numerous variables (*see* Opp. 11).

amount of accrued IOE ($217,000) associated with loans that carried a negative escrow balance (Skanderson Dep. 85:8–87:2; 92:10–13) (Skanderson Decl. ¶ 9).

Crucially, Expert Skanderson testified that for loans where Flagstar does pay IOE — *e.g.*, loans that Flagstar subservices for Lakeview — Flagstar does not credit itself for negative escrow balances (Skanderson Dep. 87:10–13). Indeed, he testified that "in general, in the industry," banks do not give themselves credit for negative escrow balances. "To the extent that interest is paid, it is paid when there is a positive escrow balance. And to the extent the balance is zero or negative, there is no positive or negative interest associated with that" (Skanderson Dep. 93:12–94:1–3).[2]

Moreover, throughout his testimony, Expert Skanderson makes clear that: (1) his opinions concerning purported expenses that are potentially offset-able are purely economic, not legal; and that (2) he agrees that he does not offer an opinion about the *extent* of costs associated with any of the various offset categories he elucidates in his report (Skanderson Dep. 123:20–25). His opinions about these categories of offsets are not based on any individual review of any class loan or any expenses Flagstar actually may have incurred in servicing the class loans herein (Skanderson Dep. 124:22–25). Indeed, in his deposition, he conceded that he did not know the parameters of class loans Flagstar has classified as "in foreclosure" or "in default," as they were provided to him in the form of tabulations (Skanderson Dep. 115:19–21). Rather, his opinions regarding potential costs imposed on Flagstar with respect to all of the categories of offsets (*e.g.*, loans modifications) are solely based on his "extensive experience in mortgage servicing" (Skanderson Dep. 126: 19–21);

---

[2] Plaintiffs point to Expert Skanderson's testimony for the proposition that the "industry norm" is for banks not to credit themselves for negative escrow balances. Flagstar objects, stating that they mischaracterize Expert Skanderson's testimony, and that their "argument of an 'industry norm' should be excluded as it lacks foundation, is speculative, and relies on improper expert opinion. See FRE 701-705, 900-902, 1000-1004" (Opp. 11). First off, Expert Skanderson is a banking expert with extensive experience in that field. Not only has he worked in the compliance department of a bank, but he has testified and submitted expert reports in many bank related litigations, including those concerning loan servicing. Moreover, his testimony shows that he did not speculate when he proffered this opinion. Rather, he based it, in part at least, on knowledge he acquired during the course of another litigation involving another bank. It thus strains credulity that Flagstar now objects to its own expert's testimony, contending that it lacks foundation.

(*see, e.g.*, Skanderson Dep. 116:19–20) ("any default, I would argue, would impose costs on the servicer").  For illustration, some of the costs that he opines are potentially offset-able, include costs Flagstar incurred in *preparing* a loan modification agreement (Skanderson Dep. 127:11–15).

## ANALYSIS

Given that liability under Section 17200's "unlawful" prong — using Section 2954.8(a) as the predicate offense — was already established in a prior order, what remains is the appropriate remedy and/or remedies.  Plaintiffs and the class seek both restitution and injunctive relief.

"A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices."  *Cortez v. Air Filtration Products Co.*, 23 Cal.4th 163, 173 (2000).  Under Section 17203 of California's Business and Professions Code:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.  The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

A court's discretion in fashioning a remedy under Section 17203 "is very broad."  *Cortez*, 23 Cal.4th at 180.   In addition to injunctive relief — "the primary form of relief" available under Section 17200 — Section 17203 also provides for restitution.  *See In re Tobacco II Cases*, 46 Cal.4th 298, 319 (2009).

"[W]hat would otherwise be equitable defenses may be considered by the court when the court exercises its discretion over which, if any, remedies authorized by [S]ection 17302 should be awarded."  *Cortez*, 23 Cal.4th. at 179–80.  Indeed, "[a] court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute."  *Id*. at 180.  Equitable defenses, however, "may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct."  *Id*. at 179.

**1.    RESTITUTION.**

This order finds that an award of $8,101,175.64 in restitution is warranted under Section 17203 to restore the unpaid IOE that Flagstar failed to pay to class members through its unlawful practice as stated herein.  This amount is supported by substantial evidence.  Moreover, Flagstar has not carried its burden in showing there is any substance to its categories of so-called offsets.  Importantly, Flagstar has not shown that it levied any charges against any class members for any of the expenses that it now contends it incurred — and ought to be able to offset against restitution — at the moment in time that they purportedly occurred.  Instead, its attempt is a gimmick to manufacture charges after-the-fact based on amorphous evidence, such as its aliquot share of general overhead.[3]

Aside from offering general evidence about the number of class loans that were "in foreclosure," and/or in "in default," Flagstar offers no evidence — specific or globalized — concerning the dollar amount of any expenses it claims those loans subjected it, and for which it argues it is entitled to offsets.  Its only effort is a vague declaration about the average cost that foreclosures — not any associated with any particular loan in this litigation — sometimes impose on it (*see* White Decl. ¶ 6).  This is in stark contrast to the $8,101,175.64, which was calculated on an account-by-account basis.

Moreover, with respect to one of the other categories of its purported offsets (*i.e.*, bankruptcies), it doesn't even provide any evidence.  Lastly, with respect to class loans that carried negative escrow balances, it also fails to provide any dollar amount of any alleged cost to it.  In any event, as Flagstar's own expert testified, Flagstar's own practice is to not charge its customers for any cost associated with negative escrow balances.  For the following reasons, equity demands that class members be paid full restitution without any offsets thereto.

Restitution under California's Unfair Competition Law "serves two purposes — returning to the plaintiff monies in which he or she has an interest and deterring the offender from future violations."  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 695 (2006)

---

[3] The $8,101,175.64 figure excludes the amount of interest owed to the four class members who opted out, and all accrued amounts that Flagstar has retroactively paid to borrowers whose loans it subservices on behalf of third-party investors, such as Lakeview.

United States District Court
Northern District of California

(citations omitted).  These dual purposes are concurrent rather than independent.  Restitution "must be of a measurable amount to restore to the plaintiff what has been acquired by violation[] of the statute[], and that measurable amount must be supported by [substantial] evidence." *Id*. at 698–70.

"The concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person." *Cortez*, 23 Cal.4th at 178.  "Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003).  In *Cortez*, for example, the defendant failed to pay its employees the lawful rate for overtime.  The California Supreme Court determined that "earned wages that are due and payable pursuant to . . . the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice." 23 Cal.4th at 178.  It reasoned that because "equity regards that which ought to have been done as done [citation], and thus recognizes equitable conversion" it follows that "unlawfully withheld wages are property of the employee within the contemplation of the UCL." *Ibid*.  It thus concluded "that orders for payment of wages unlawfully withheld from an employee are also a restitutionary remedy authorized by [S]ection 17203." *Id*. at 177.

Similarly, here, the IOE that Flagstar unlawfully withheld from class members are also the proper subject of a restitutionary remedy under Section 17203.  Class members' interest in accrued IOE became vested when the IOE would have otherwise became due: at the end of each calendar year or, for escrow accounts that closed before then, at the point of closure.

Moreover, the total amount of accrued and unpaid IOE is a "measurable amount" that is supported by "substantial evidence." *See Colgan*, 135 Cal.App.4th at 698–70.  Both experts analyzed the daily escrow balances of all class members from January 2014 through December 2019.  They applied a two percent annual interest rate — the minimum IOE rate required by Section 2954.8(a) — to the positive daily escrow balances of all class members.  They ignored days where any class member carried either a negative escrow balance or a balance of zero.  In

doing so, both experts were able to calculate with mathematical precision the total amount of IOE necessary to restore borrowers to the position in which they would have been but for Flagstar's unlawful conduct.  Importantly, both experts arrived at the same figure.  Thus, there is no dispute as to the total amount of IOE that Flagstar would have been required to pay class members through December 2019 had it been complying with Section 2954.8(a).

Rather, the dispute concerns whether or not that amount should be offset by Flagstar's alleged unreimbursed expenses that it claims to have incurred with respect to class loans that were "in default," "in foreclosure," went through bankruptcy, or held negative escrow balances.

Flagstar points to the 8,936 class loans that were "in default" at some point between 2014 through 2019, the 722 class loans that were "in foreclosure" during the same period, and the 41,523 class loans that had a negative escrow balance for at least one day during the same period, to argue that "there are triable issues of material fact regarding whether Flagstar is entitled to reduce or entirely offset the accrued IOE sought in restitution for these loans, and in what amount" (Opp. 10).  More specifically, it contends that "the amount of IOE restitution for loans that were in default or had at least one negative escrow balance should be offset on the basis of legal, contractual, or equitable principles" because (*ibid.*) (internal citations omitted):

> Flagstar incurs unreimbursed costs as a result of the customers' default and foreclosure, including property inspections, retention of counsel, retention of a foreclosure trustee, waived fees, filing fees, and Broker Price Opinions.  For loans with negative escrow balances, Flagstar incurs unreimbursed costs as it advances its own funds to make a customer's tax and insurance payments. According to Flagstar's expert, calculating the cost requires determining the amounts advanced, the amount of time over which the amounts were advanced, and Flagstar's funding cost (i.e., the effective interest rate paid for working capital) at the time each amount was advanced.

This order disagrees with Flagstar's contention that there are disputed issues of material fact.  To the contrary, the issues it raises present questions of law and/or considerations of equity.  *See Cortez*, 23 Cal.4th at 173, 180 ("A UCL action is an equitable action" and a court's discretion in fashioning a remedy is "very broad.").  Balancing the equities, this order finds that Flagstar has not shown a basis for reducing the amount of restitution by its purported

17

categories of offset.  Had Flagstar adduced concrete evidence showing that it had levied specific charges against a specific class loan within the relevant class period, the undersigned would have been amenable to holding a trial and requiring Flagstar to give notice to those class members, so that they could contest those charges at trial.  But what Flagstar did instead was pull a gimmick — an after-the-fact manufacturing of factual issues for trial where none existed prior to class certification.  The supposed offset-able charges that Flagstar now complains of will not be allowed by way of defense because Flagstar failed to show a contractual, legal, or equitable basis for them to be offset.  Had it done so, it would have produced that evidence.  Indeed, it was its burden to do so.  Tellingly, it failed to produce a shred of concrete evidence showing that it perfected any such charges and/or expenses by levying them against any of the class members prior to class certification, or that any such charges remain unpaid to Flagstar.  Rather, Flagstar produces amorphous evidence, stating generally, for example, that loans that go through foreclosure cost it, *on average*, approximately eight thousand dollars.  And yet, as discussed in detail below, neither itself nor its expert, tethered any such purported foreclosure expenses to any of the class loans herein.  In sum, there are no issues for trial because the amount and method of restitution are undisputed, and because this order rejects Flagstar's defenses.  Such rejection is without prejudice to pursuing those individual claims against individual borrowers.

Furthermore, the decisions Flagstar cites to are inapposite here.  The decisions it cites to stand for the proposition that an award of restitution under Section 17203 does not allow consumers to recover the full amount they paid for a product or service when such product or service had some value to consumers, notwithstanding the alleged deceptive advertising.  For instance, in *Chowning v. Kohl's Dep't Stores, Inc.*, 2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) (Judge Gary Klausner), the plaintiffs purchased the defendant's products because the defendant's juxtaposition of a lower "selling price" next to a significantly higher price purporting to represent the item's "original price" created the belief that they were receiving a certain discount.  Judge Klausner noted that "any proposed method [of restitution] must account for the benefits or value that a plaintiff received at the time of purchase."  *Id*. at 6; *see*

United States District Court
Northern District of California

*also In re POM Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (Judge Dean D. Pregerson) ("Plaintiffs do not cite, nor is the court aware of, any authority for the proposition that a plaintiff seeking restitution may retain some unexpected boon, yet obtain the windfall of a full refund and profit from a restitutionary award.").

The banking decision Flagstar cites to sings the same tune. *See Corvello v. Wells Fargo Bank N.A.*, 2017 WL 3449072 (N.D. Cal. May 4, 2017) (Judge Vince Chhabria).  The plaintiffs there brought a Section 17200 claim against Wells Fargo based on allegations that it misled borrowers into enrolling in trial period payment plans incorrectly believing it would lead to permanent loan modifications within a certain time.  It was undisputed that the plaintiffs would have lost the right to stay in their homes if they did not make the trial period payments.  Accordingly, Judge Chhabria granted the bank's motion for summary judgment because he found that the plaintiffs had "not presented evidence supporting any theory of restitution that account[ed] for this benefit."  2017 WL 3449072, at *2.

All of these decisions are distinguishable.  The challenged products and practices in these mislabeling and deceptive advertising cases conferred some benefit on the plaintiffs.  By contrast, here, Flagstar's unlawful conduct — failure to pay IOE in accordance with California law — conferred no benefit to any of the class members.  Unlike in *Chowning*, plaintiffs here were not duped into purchasing a tangible product such that any award of restitution must account for the value of what they believed they received.  In contrast to *Corvello*, moreover, the unlawful conduct here did not confer any benefit to class members.  Put differently, whether or not Flagstar paid IOE in compliance with Section 2954.8(a), it had no bearing on whether or not class members could stay in their homes.

These decisions would have had import here, if, hypothetically, Flagstar had been paying class members part of the IOE required by Section 2954.8(a) all along, say, one percent.  In that event, surely, any award of restitution should have accounted for the one percent IOE — *i.e.*, the benefit — class members had received.  Here, to repeat, all accrued IOE amounts that Flagstar has already paid to class members have been excluded from the total figure of

United States District Court
Northern District of California

restitution ($8,101,175.64).  Unlike the decisions Flagstar cites, therefore, not double dipping or windfalls will result here.

To the extent Flagstar is trying to offset total restitution by administrative expenses that it *may* have incurred in connection with services and disputes unrelated to the unlawful business practice discussed herein — *e.g.*, the cost of drafting a loan modification agreement or attorney's fees associated with foreclosures — none of the decisions it cites to provide support for such a fanciful proposition.  To the contrary, as plaintiffs point out, California law limits a lender's recourse to foreclosure of the secured asset.  *See, e.g., Sec. Pac. Nat'l Bank v. Wozab*, 51 Cal.3d 991, 997 (1990).

Furthermore, Flagstar isn't servicing class members' loans for free.  Rather, the owner of a loan's mortgage servicing rights receives income in exchange for servicing that loan (Chang Dep. 14:3–19).  It therefore strains credulity that Flagstar wants to offset the amounts it unlawfully withheld by its overhead expenses, which, presumably, already factor into its servicing fee.  Notably, Flagstar's argument for offset for alleged costs it incurred with respect to escrow accounts that carried a negative balance is particularly egregious given that Flagstar's own expert testified that for loans where Flagstar does pay IOE, Flagstar does not credit itself for negative escrow balances (Skanderson Dep. 87:10–13).  Thus, seeking to apply a discount based on a classification that is contrary to Flagstar's own practice offends — and, is antithetical to — any notion of equity.

Lastly, Flagstar's evidence of the various unreimbursed expenses it claims to have incurred is speculative, at best.  For instance, though it puts into the record that it "often" incurs an "average" cost of approximately eight thousand dollars in connection with loans that proceed to foreclosure, it has not adduced any evidence that any of the class loans herein inflicted any such expense.  As Albers testified, the 722 class loans that he identifies as having been "in foreclosure," refer not necessarily to loans associated with completed foreclosure proceedings, but to loans associated with a foreclosure "status code" (Albers Dep. 49:11–19).  Loans bearing this designation can include active, suspended, on hold, and completed foreclosures (*id*. at 50:16–22).  Yet, Albers' tabulation that 722 class loans bear this

designation fails to identify how many fall into each bucket, let alone any alleged unreimbursed expense associated with any which one.  For instance, as Albers testified, even for borrowers that go on to cure their default and thus suspend foreclosure, the designation of "in foreclosure" still remains (*id*. at 52:2–13).  In making his calculation that 722 class loans were "in foreclosure," Albers did not look at any of the individual loan files.  Rather, he just added up the loans that had the "in foreclosure" designation in Flagstar's system without discriminating as to their various circumstances (*id*. at 50:9–15).  Thus, as far as we know, it is entirely possible that all 722 class loans that are associated with a "status code" of "in foreclosure" later cured their default, suspended foreclosure, and Flagstar thereby bore no unreimbursed expense.  Again, it was Flagstar's burden to adduce evidence on these issues.  It failed.

Moreover, as plaintiffs point out, Expert Skanderson's opinion regarding the various categories of offsets he elucidated suffer from similar deficiencies.  For one thing, Flagstar just provided Albers' tabulations to Expert Skanderson without explaining how each category was constructed or what each category even meant.  Expert Skanderson agreed that he did not know the exact parameters of any of the categories of offset he identified in his report — except for negative escrow balances — and that they were provided to him in tabulated form.  Expert Skanderson also did not examine any class-loan-specific documents.  Thus, his opinions about the *fact* of expenses is not tethered to any particular class loan herein.  Unsurprisingly, therefore, he offers no opinion about the *amount* of any such expenses.

In short, Flagstar has not adduced any evidence that *any* of the class loans herein subjected it to unreimbursed expenses, assuming Flagstar claims were even legally cognizable in the first instance.  The same is true for all of the purported categories of offsets.  Accordingly, Flagstar has failed to carry its burden concerning its defenses of offset.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986) (on an issue where the nonmoving party will have the burden of proof at trial, the party moving for summary judgment need only point out "that there is an absence of evidence to support the nonmoving party's case.").

2.	**PRE-JUDGMENT INTEREST.**

"Although a court may not award prejudgment interest under Civil Code section 3287, subdivision (a), to a restitutionary award under the UCL, a court nevertheless has discretion in equity to award prejudgment interest on a UCL award as a component of restitution." *Espejo v. The Copley Press, Inc.*, 13 Cal.App.5th 329, 375 (2017). "The policy underlying an award of prejudgment interest is to make the injured party whole for the accrual of wealth that could have been produced during the period of loss." *Ibid.* "[W]here, as here, an award of prejudgment interest is a matter of the trial court's equitable discretion, the requirement under Civil Code section 3287, subdivision (a), that damages be 'certain, or capable of being made certain by calculation' does not apply." *Id.* at 376.

Here, but for Flagstar's unlawful conduct, class members' escrow accounts would have been credited two percent IOE at the end of each calendar year or, in the event of termination before then, such amounts would have been disbursed to them at the point of termination. In turn, any credited IOE would have earned two percent IOE. Importantly, Flagstar's own expert agreed that, economically speaking, a two percent prejudgment interest rate represented class members' "opportunity cost" (Skanderson Dep. 23:8–21). For disbursed IOE, class members would have been able to earn interest elsewhere. Either way, therefore, had class members been in possession of the wrongfully withheld IOE, they would have been able to earn interest on those amounts. This order thus finds that awarding plaintiffs two percent prejudgment interest is a necessary component of restitution in order to make class members whole.

As already discussed, Expert Olsen calculated total accrued IOE to class members with near mathematical certainty. Moreover, in calculating prejudgment interest to the class, he made assumptions — *e.g.*, crediting class members' escrow accounts for accrued IOE at the end of each calendar year — that were consonant with Flagstar's own practices. Thus, his calculation of prejudgment interest bears a reasonable relationship to making the class members "whole for the accrual of wealth that could have been produced during the period of loss." *Espejo*, 13 Cal.App.5th at 375.

Accordingly, this order hereby awards class members the requested two percent of prejudgment interest as a component of their award of restitution. According to Expert Olsen, this amount was $541,053.11 as of the May 21, 2020; with $443.90 accruing every day since (Olsen Decl. ¶ 5).

### 3. INJUNCTIVE RELIEF.

In addition to restitution, plaintiffs also seek a permanent injunction. *See In re Tobacco II Cases*, 46 Cal.4th 298, 319 (2009) ("[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction."). Again, Flagstar does not currently pay IOE to class members whose mortgage servicing rights Flagstar owns and whose loans it currently services. This is an undisputed fact. To avoid repetitive lawsuits, therefore, the Bravos, on behalf of themselves and a subset of similarly situated class members, seek a permanent injunction ordering Flagstar to prospectively comply with Section 2954.8(a) from January 1, 2020, onward — namely, to pay them two percent interest on funds held in their escrow accounts. Plaintiffs seek such relief not just with respect to the described subclass, but with respect to "to *all* [of Flagstar's] California customers" (Dkt. No. 180 at 12) (emphasis in original).

Flagstar mounts both procedural and substantive challenges to the Bravos' request for injunctive relief. To the following extent and for the following reasons, the request for injunctive relief is GRANTED. Such relief is limited to the subclass certified herein.

### A. PROCEDURAL ISSUES.

As an initial matter, Flagstar lodges procedural attacks to oppose plaintiffs' request for injunctive relief. It argues that Kivett is the only named plaintiff and "the sole class representative" in this action, and injunctive relief is thus improper because Kivett — a *former* customer whose loan Flagstar no longer services — does not have standing to seek injunctive relief on behalf of class members' whose loans Flagstar *currently* services but for which it does not pay IOE. Put differently, it argues that the Bravos — *current* Flagstar customers — are not named plaintiffs and thus cannot serve as co-class representatives for a subclass of *current* Flagstar customers. The crux of Flagstar's argument is that once Kivett was granted leave to

file his second amended complaint to add the Bravos as named plaintiffs, Kivett failed to formally file the second amended complaint as a standalone document on the docket.  In its view, therefore, the first amended complaint is still the operative complaint.  Flagstar also argues that Kivett's failure to formally file the second amended complaint deprived it of procedural safeguards afforded it by the Federal Rules of Civil Procedure, such as asserting affirmative defenses.

This order disagrees and finds that the second amended complaint is the operative complaint.  First off, Kivett had attached the second amended complaint to the declaration of his attorney as part of his motion for leave to amend (Dkt. No. 83-2).  The second amended complaint differed from the first amended complaint only insofar as it added the Bravos as named plaintiffs.  It remained similar in all other material respects.  Although Kivett should have formally filed it again on the docket as a standalone document, that failure is not fatal here.  Flagstar had access and notice of the contents of the second amended complaint.  And, significantly, Flagstar subsequently filed an answer to the second amended complaint, asserting all its defenses therein (Dkt. No. 178).  At bottom, the parties have acted for all intents and purposes as though the Bravos are named plaintiffs, and Flagstar's cries of prejudice are insincere.

Moreover, context and chronology are important here.  This order thus finds it helpful to place events in context before proceeding further.  Importantly, the class certification order granted Kivett's request to file his second amended complaint in express contemplation of ensuring there would be co-class representatives whose loan Flagstar currently services such that standing to pursue injunctive relief wouldn't be an issue (*see* Dkt. No. 120 at 4, 12–13); (*see also id.* at 13) ("Plaintiff's motion for new plaintiffs to intervene and for leave to amend to add new class representatives is provisionally **Granted**.").

That order gave Flagstar until January 2, 2020, to show cause why the Bravos should not be authorized to co-represent the class; and required the facilitation of discovery from the Bravos to Flagstar.  Specifically, the Bravos were required to promptly turn over their records

to Flagstar and sit for depositions before the due date for Flagstar to show cause.  The Bravos

obliged.

Yet, Flagstar did not show cause by said deadline.  Instead, in the parties' joint stipulation

regarding class notice that was filed on January 2, 2020, it opted for a footnote therein,

purporting to reserve its ability to do so "in the future, including at trial" (Dkt. No. 164 at 1

n.1).  Simultaneously, plaintiffs again announced their intention of pursuing injunctive relief

(*see id*. at 3 n.2) ("Plaintiffs will seek injunctive relief covering the period from January 1,

2020 forward.").  Meanwhile, the December 5, 2019, deadline to file dispositive motion had

come to pass.

Accordingly, on March 13, 2020, plaintiffs filed a proposed order, unaccompanied by a

motion, requesting the certification of a subclass "consisting of all members of the certified

[c]lass who (a) did not opt out and (b) are current customers of Flagstar" pursuant to Rule

23(b)(2) for the purpose of seeking injunctive relief (Dkt. No. 155).

Flagstar objected.  It filed an administrative motion to strike plaintiffs' proposed order for

an injunction subclass on the ground that the class certification order specifically confined its

holding to a certification under Rule 23(b)(3) (Dkt. No. 156) (citing Dkt. No. 120 at 13) ("class

is certified as to plaintiff Kivett's Section 17200 claim, except for prospective injunctive

relief.").

In response to this dispute along with plaintiffs' representation that this action could be

decided if given further opportunity to move for summary judgment, an order dated March 23,

2020, invited each party to file a motion for summary judgment "addressing both damages and

injunctive relief.  The parties shall include any briefing they deem necessary in light of Rule

23(b)(2)" (Dkt. No. 171).  Thus, the parties dispute about a Rule 23(b)(2) subclass has

cascaded into this current motion, as now discussed.

### *(i)*     *Subclass of Current Flagstar Customers Under Rule 23(b)(3).*

"An order that grants or denies class certification may be altered or amended before final

judgment."  Rule 23(c)(1)(C).  Accordingly, this order hereby certifies a Rule 23(b)(2) subclass

1    of class members whose loans Flagstar currently services, and appoints Bernard and Lisa

2    Bravo as subclass representatives, in order to seek injunctive relief on behalf of the subclass.

3                    *(a)      Rule 23(a) Requirements are met.*

4            In previously certifying a class of both former and current Flagstar customers under Rule

5    23(b)(3) based on the same claim, a prior order already found that all of the requirements of

6    Rule 23(a) were met (*see* Dkt. No. 120).  With the exceptions noted below, the same rationales

7    apply here and need not be discussed in detail herein again.

8            Where this subclass varies is as to numerosity, typicality, and adequacy of representation.

9    The main class comprises of both former and current Flagstar customers.  According to expert

10   Olsen, as of December 31, 2019, the existent certified class includes 65,477 current Flagstar

11   customers, 14,907 of whom Flagstar still does not pay any IOE to (Olsen Decl. ¶ 10).

12   Numerosity is thus satisfied.  Moreover, Bernard and Lisa Bravo's claims — harm caused by

13   Flagstar's ongoing violations of Section 2954.8(a) — are typical of other class members whose

14   loans Flagstar currently services but does not pay IOE to.

15           Now, as to the adequacy of the Bravos as subclass representatives.  First off, despite the

16   facilitation of discovery from the Bravos to Flagstar — including depositions — and ample

17   opportunity to show cause why the Bravos should not be authorized to co-represent the class,

18   Flagstar failed to do so by the required deadline.  Nonetheless, this order still considers

19   Flagstar's current arguments.

20           Flagstar contends that the Bravos are not adequate representatives to seek injunctive

21   relief on behalf of the subclass because they lack standing.  It points to the fact that their

22   escrow account carried a negative balance of $239 for thirty days in 2018 (*see* Albers Decl. ¶

23   7).  Flagstar thus claims that it is entitled to "offset" the unspecified alleged cost of advancing

24   that amount to the Bravos against any amount of accrued IOE owed to them, which it argues

25   "may" preclude the Bravos from having suffered any injury in fact (Opp. 21).

26           This order disagrees on various grounds.  *First*, as discussed earlier in this order, Flagstar

27   has not shown that it has a cognizable defense of offset based on negative escrow balances.

28   But, even if it did, simple math tells another story.  Namely, it is undisputed that at two percent

United States District Court
Northern District of California

26

interest, the funds held in the Bravos' escrow account accrued $39.57 in IOE from origination through December 31, 2019; and that Flagstar has not paid this amount. Hypothetically then, even giving Flagstar the benefit of a glaring fifty percent interest rate for its cost of working capital in advancing the $239 to the Bravos for thirty days — equaling $9.82 — and offsetting it against the amount owed to the Bravos, $29.75 would still remain. Tellingly, Flagstar avoids this math. At bottom, the Bravos' injury — a sum certain — is "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

*Second*, it is undisputed that Flagstar does not pay any IOE on class loans for which Flagstar owns the mortgage servicing rights (Ryan Dep. 34:13–19; 45:14–16) (Stip. Facts ¶ 6); nor is it disputed that Flagstar owns the Bravos' mortgage servicing rights and that it currently services their loan. Thus, Flagstar remains in continuing violation of Section 2954.8(a), causing ongoing injuries to the Bravos, as it is not paying them the two percent interest on their escrow funds. Importantly, then, the Bravos injuries are continuing and imminent, traceable to Flagstar's ongoing violation of Section 2954.8(a), and an injunction will more than likely redress that harm. *See Lujan*, 504 U.S. at 561. Irrespective of the amounts owed to them in restitution for accrued IOE arising out of Flagstar's past violations, therefore, the Bravos have standing to seek injunctive relief for Flagstar's present and future violations of Section 2954.8(a). Accordingly, the Bravos have standing and are adequate subclass representatives.

Lastly, Flagstar's challenges to the sufficiency and admissibility of the Bravos' declaration are red herrings (Opp. 22–23) (citing Bravos Decl. ¶ 4) ("The declaration is riddled with vague and speculative representations, none of which actually show that the Bravos have actually been injured by Flagstar's challenged conduct"). The evidence adduced by Flagstar itself belies its assertion and demonstrate that the Bravos have standing. For example, it submits the declaration of Mansell who swears that: (1) Flagstar owns the mortgaging servicing rights to the Bravos' loan; (2) Flagstar began servicing their loan beginning in February 2018 through the present; (3) Flagstar created and maintains an escrow account pursuant to their deed of trust; (4) "[a]t 2% interest for funds held in their escrow account,

$39.57 would have accrued on the Bravos loan from origination through December 31, 2019" (Mansell Decl. ¶¶ 6–10).

### (b)    The Condition of Rule 23(b)(2) is also met.

The condition of Rule 23(b)(2) itself is also met.  Because Flagstar continues not to pay the two percent interest required by Section 2954.8(a) to a subclass of class members — such as the Bravos — whose loans servicing rights Flagstar owns and currently services, Flagstar "has acted or refused to act on grounds that apply generally to the class, so that the final injunctive relief . . . is appropriate respecting the [sub]class as a whole."  Rule 23(b)(2).

Furthermore, the parties had already stipulated that if a subclass is certified under Rule 23(b)(2), another round of notice would not be necessary (Dkt. No. 144).  Regardless, notice to a class certified under Rule 23(b)(2) is discretionary.  *See* Rule 23(c)(2)(A).

In order to obtain injunctive relief, therefore, a subclass of the existent class that are current Flagstar customers is hereby CERTIFIED pursuant to Rule 23(b)(2).  Additionally, the Bravos are hereby APPOINTED subclass representatives.

### (ii)    Subclass members' standing is irrelevant to injunctive relief.

Next, Flagstar makes multiple arguments, the thrust of which is that all subclass members must have standing in order for injunctive relief to issue.  Not so.  To the contrary, our court of appeals has held that in seeking injunctive relief, as opposed to individual monetary damages, only the class representative need have standing.  *See Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020) (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).  Similarly, "actions for relief" under Section 17200 may be brought by "a person who has suffered injury in fact and has lost money or property as a result of their unfair competition."  Bus. & Prof. Code § 17204.  In representative actions, Section 17204 is satisfied as long as the representative plaintiff meets the standing requirements.  *In re Tobacco II Cases*, 46 Cal.4th at 315–16.

For reasons already discussed, the Bravos, the subclass representatives, have standing. They can thus pursue injunctive relief on behalf of the class.

### B.      FLAGSTAR'S SUBSTANTIVE OBJECTIONS TO INJUNCTIVE RELIEF.

The Bravos and the subclass of current Flagstar customers seek a permanent injunction enjoining Flagstar from the unlawful business practice stated herein.  This order finds that such relief is appropriate under Section 17203 of the California Business and Professions Code, and necessary to prevent further harm to current Flagstar customers.  The Effective Date shall be January 1, 2020.   The following subclass-wide relief is therefore ordered:

1.  Flagstar shall credit subclass members' escrow accounts for any IOE that may have accrued after January 1, 2020.  Consistent with its current practices and with Section 2954.8(a) itself, Flagstar shall do so at the end of each calendar year for escrow accounts that remain active.  For example, Flagstar shall credit the escrow accounts of subclass members for any IOE that has already accrued and will accrue in 2020 on January 1, 2021.  That process shall continue each year thereafter.

2.  For class members whose loans (a) Flagstar serviced in 2020; (b) did not pay IOE on; (c) whose escrow accounts were subsequently closed after January 1, 2020, but before the issuance of this order, Flagstar shall retroactively pay those class members their accrued IOE, if at all, for the relevant time period.  Flagstar shall do so by January 29, 2021.

3.  Similarly, going forward, subclass members whose loans Flagstar will stop servicing for whatever reason before the end of a calendar year, shall be paid their accrued IOE, if at all, at the point where Flagstar closes their escrow accounts.

4.  Consistent with Section 2954.8(a), the amount of IOE Flagstar pays shall be at least two percent.

### CONCLUSION

To the foregoing extent, plaintiffs' motion for summary judgment is **GRANTED**. Plaintiffs' are **AWARDED** $8,101,175.64 in restitution for accrued and unpaid IOE to the class through December 31, 2019, as well as prejudgment interest of two percent thereon.  Plaintiffs should calculate the account-by-account allotment to each class member — with IOE and

United States District Court
Northern District of California

prejudgment interest stated separately — and file a form of judgment with class members'

names that gives exact recovery.  The injunction herein is limited to the subclass.

**IT IS SO ORDERED.**

Dated:  December 10, 2020.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California